S. Augustus Black, of Columbia, S. C. (Thomas, Cain & Black, of Columbia, S. C.; and H. W. Story and John B. Baker, both of Milwaukee, Wis., on the brief), for appellant.

John Grimball and C. T. Graydon, both of Columbia, S. C., for appellees.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

**ALLIS-CHALMERS MFG. CO. v. GREEN et al.**

No. 5837.

United States Court of Appeals Fourth Circuit.

April 4, 1949.

The complaint in this suit charges that the Allis-Chalmers Manufacturing Company failed to fill an order for goods of the approximate value of $927,500.08 submitted to it on June 20, 1945, under a dealership contract by Harry D. Green, a dealer in Columbia, South Carolina, and thereby Allis-Chalmers broke the contract and Green suffered a loss of profits in the sum of $200,000. The case was submitted to a jury and resulted in a verdict for the plaintiff in the sum of $3,587.76. The defendant moved for a directed verdict in its favor before the submission of the case to the jury, and after the verdict, made a motion for judgment in its favor, notwithstanding the verdict, which was overruled.

The appellant contends: (1) that the contract was unenforceable for lack of mutuality; (2) that the rejection of the order was not a breach of the contract but an exercise of the right to terminate it in conformity with its express terms; (3) that the order was not given in good faith and was not authorized by the contract and therefore the plaintiff was not entitled to delivery of the goods specified in the order. In our opinion, the judgment must be reversed on the third ground, to which we confine our attention.

The contract granted to the dealer the non-exclusive right to sell the farming machinery of the company for agricultural purposes only, subject to the conditions of the agreement, in the territory somewhat vaguely defined as Columbia and vicinity. The company agreed to sell machinery, except agricultural implements, to the dealer at the company's current list prices, f. o. b. the factory, in effect at the date of the shipment, and also agreed to sell agricultural implements to the dealer at the company's current list prices f. o. b. dealer's factory branch in effect at the date of shipment. The contract also fixed the terms of payment upon the purchase of the machinery.

The dealer agreed during the life of the agreement to buy for resale in the territory assigned to him a sufficient quantity of the machinery to meet the trade requirements of the territory. The company agreed to deliver the machinery to the dealer, as specified at the time of the dealer's order, subject to delays due to causes beyond the company's control, and subject to the voluntary or compulsory application of priority ratings and delays in transportation or in getting materials.

It was provided that the contract might be terminated at any time by either party by mailing written notice by registered mail to the last known address of the other party; and that it should terminate, without notice, by expiration on November 1, 1945.

The defense turns upon the restrictive provision of the agreement whereby the company's obligation to deliver merchandise was made subject, not only to delays due to causes beyond the company's control, but also to the voluntary or compulsory application of priority ratings and delays in transportation and in getting materials.

The order of June 20, 1945, was placed shortly after the termination of hostilities in the European theater of war, and while the war with Japan was still going on. During the entire period of the war the company's production was directed and limited by government regulations, and even after these were withdrawn, (the rationing orders of the War Food Administration in September, 1944, and the limitation of production orders of the War Production Board on August 21, 1945), the company was obliged by the prevailing business conditions to revive its voluntary priorities or allocation system which it had instituted in January, 1942, shortly after Pearl Harbor. At that time the company anticipated a shortage of raw material and machinery by reason of the war, and hence it worked out a priority system for the distribution and allotment of its farm equipment. It adopted a proportional system based on its production during the years 1940 and 1941, and each of the company's 29 branches in the United States was allotted the same percentage of the company's output as it had disposed of during the base period. In like manner, each of the 2,583 of the company's dealers in the United States was allotted by the branch to which he was subject the same percentage of the branch's allotment as he had sold in the base period.

Information as to the apportionment plan was communicated not only to all of the branch managers, including the manager of the Charlotte branch which supervised dealers in North Carolina, South Carolina and two-thirds of Virginia, but also to all of the dealers. During the war the same plan was enforced by government regulation, and allotments were made to the branches and by them to the dealers in accordance with the system. The plaintiff in this case was one of 12 dealers in South Carolina and one of 88 dealers in the Charlotte area who were familiar with the plan and operated under it; and, as stated above, the system was continued by the company under the voluntary plan after

the government regulations were withdrawn.

In June, 1945, the plaintiff received information from certain correspondence between him and the company, that his dealer's contract would not be renewed upon its expiration on November 1, 1945. In a letter of June 5, 1945, he requested the company to send him a set of plans and specifications for a farm machinery building, and by an answering letter his branch manager warned him that as his ideas and those of the branch manager of conducting the business did not agree, he should take into consideration in making any plans for the future that he would not then be handling the company's line of equipment. Again on June 18, 1945, in a letter from the branch office, it was suggested that the plaintiff make his arrangements for the future with the thought in mind that he would not be representing the company.

The order of June 20, 1945, followed shortly thereafter, and the plaintiff in his testimony admitted that the knowledge that he would not represent the company after the expiration of his pending dealership contract influenced him in sending the order.

The size of the order was not only unprecedented but it was so great that the plaintiff could have had no reasonable expectation that the company would be able to fill it without depriving other dealers in the Charlotte branch of their fair share of deliveries, or in other words, without completely changing the company's method of doing business. The order comprised 2,839 items of farming machinery which would have filled 158½ railroad cars, and would have cost $927,500.58. In order to perceive the extraordinary character of the order, it is necessary only to compare the cost of the goods involved with the sum of $364,-034.67, which was the total price of all the merchandise which the company was able to allot to the Charlotte branch for its 88 dealers between June 20 and November 1, 1945, when plaintiff's contract expired. Moreover, the order should be compared with the amount of the merchandise bought and sold by the plaintiff during the years immediately preceding. In 1938 he sold 67 units of machinery; in 1940, 172 units;

in 1941, 142 units; in 1942, 79 units; in 1943, 35 units, and in 1944, 60 units.

In view of these facts, it is obvious that there is no reasonable ground for the contention that the plaintiff believed that his order was in accordance with the priority system which limited all of the company's deliveries, or that the company would be able to fill it; and it is not without significance that subsequent to the order of June 20, 1945, the plaintiff continued to order and accept material under the priority system, and received between June 20 and November 1, 1945, 7 items of the aggregate value of $6,910.66.

The branch manager at Charlotte on June 26, 1945 returned the order to the plaintiff and wrote him that, under the company's method of handling merchandise, it was not in a position to accept orders covering major units of equipment that were not available. This refusal to honor the order was entirely justified, for it called for goods far in excess of the plaintiff's fair share of the goods which the company was able to furnish to its Charlotte branch, and far more than the plaintiff had any reason to expect the company to deliver.

The judge, however, submitted the case to the jury because of certain evidence offered by the plaintiff tending to show that the company had discriminated against the plaintiff and had not delivered to him his fair share of the goods under the voluntary allotment plan. This testimony indicated that the plaintiff had had disputes with the manager of the Charlotte branch and that other dealers in smaller territory than the Columbia area assigned to the plaintiff were getting more machinery from the company than he was, in spite of the fact that in a basic period he disposed of more goods than any other agent in South Carolina.

On the basis of this evidence which was controverted by the company's witnesses, the judge instructed the jury that if the company did all that it could to get materials and manufactured goods, and if it apportioned the goods fairly amongst the dealers and gave the plaintiff his fair share for the territory assigned to him, then he had no right to recover; but if the company failed to give the dealer all that he was entitled to and gave it to somebody else,

then the company would be liable in damages in the amount of the net profit which the plaintiff would have earned on the goods that the company failed to deliver. It was doubtless by reason of this charge that the jury found a verdict for a small sum in the plaintiff's favor.

In our opinion, this instruction was erroneous, even though it be assumed that the agreement did not lack mutuality and was not terminated by the mere rejection of the order. One section thereof provided that the "company will deliver machinery to the dealer as specified at the time of the dealer's order" subject to delays for unavoidable causes and subject to the voluntary priority ratings. Obviously it was the obligation of the dealer to ascertain the requirements of his territory, and to buy a sufficient quantity of machinery to meet the requirements of his territory, subject, however, to the allotment method adopted by the company. In short, the first step in making an enforceable contract for the sale of specific goods within the general framework of the dealer's agreement was the placing of an order by the dealer; and when the order was received, it then became the duty of the company to fill it, subject to the conditions above described. But in this case the dealer failed in this duty, since the order which he applied for was one obviously beyond the power of the company to fulfill. Under these circumstances no duty was imposed upon the company to select and deliver out of the mass of items ordered those which it could supply. If it had done so, it might well have selected items which neither the dealer nor his customers would have preferred. Undoubtedly there was the obligation upon the company to treat the dealer with good faith and to give him his fair share of the merchandise, but there was the corresponding obligation upon the dealer to exercise good faith in ordering goods within the confines of the contract. The order of June 20, 1945 was so far outside the dealer's agreement that in legal significance it constituted merely an offer to enter into a new contract that the company had a perfect right to reject.

The dealer makes the contention that although the order was very large, such was the need of his territory that he could have found purchasers for all of the goods on the list. This may well have been true since there was a great dearth of manufactured goods due to the necessities of the war; but the other dealers in the Charlotte area could also have sold the goods without difficulty. The contract contemplated not only the needs of the farmers, but the capacity of the company to manufacture and deliver the goods, and the company was under no obligation to consider any order which did not conform to the priority system under which all of the dealers had been operating for the period of the war.

The order of June 20, 1945 furnishes no basis for recovery in this case, and the judgment of the District Court must therefore be reversed and the case remanded in order that judgment may be entered for the defendant.

Reversed and remanded.